UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SHUFEN MA,

Plaintiff,

v.

SAN FRANCISCO ESTUARY INSTITUTE,

Defendant.

Case No. 23-cv-05060-JCS

**ORDER RE MOTION FOR SUMMARY JUDGMENT, MOTION FOR SANCTIONS AND SEALING MOTIONS**

Re: Dkt. Nos. 75, 79, 80, 82, 89, 98, 99, 106, 108, 112

## I.    INTRODUCTION

Plaintiff Shufen Ma brought this action asserting employment discrimination claims against the San Francisco Estuary Institute ("SFEI") based on its failure to hire her as an environmental scientist over a period of several years. The sole remaining claims in the case are for age, national origin and race discrimination pursuant to Title VII of the Civil Rights Act of 1964 and the Age Discrimination in Employment Act ("ADEA") related to Defendant's failure to hire her for the environmental scientist position for which she applied on October 13, 2021. Presently before the Court are SFEI's Motion for Summary Judgment, or in the Alternative, Partial Summary Judgment ("Summary Judgment Motion"), SFEI's Motion for Sanctions Pursuant to FRCP 37 in the Amount of $3,500 ("Sanctions Motion") and multiple sealing motions. The Court finds that the motions are suitable for determination without oral argument and therefore vacates the motion hearing set for February 18, 2026 pursuant to Civil Local Rule 7-1(b). For the reasons stated below, the Court GRANTS SFEI's Summary Judgment Motion in full. Therefore, the Court vacates the Case Management Conference set for February 18, 2026 and

instructs the Clerk to enter judgment in favor of SFEI and close the case.[1]  The Court's rulings are set forth below.

## II.    SEALING MOTIONS

### A.    Legal Standards

The pending administrative motions to file under seal ("sealing motions") relate to both dispositive motions and non-dispositive motions.  The threshold for sealing documents filed in connection with dispositive motions is higher than it is for those associated with non-dispositive motions.  In particular, for dispositive motions, there is a "strong presumption" in favor of public access that can be overcome only for "compelling reasons" supported by specific factual findings that "outweigh the general history of access and the public policies favoring disclosure." *Kamakana v. City & Cnty. of Honolulu*, 447 F.3d 1172, 1178–79 (9th Cir. 2006) (citing *Foltz v. State Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122, 1135 (9th Cir. 2003) (cleaned up)). "In general, 'compelling reasons' sufficient to outweigh the public's interest in disclosure and justify sealing court records exist when such 'court files might have become a vehicle for improper purposes,' such as the use of records to gratify private spite, promote public scandal, circulate libelous statements, or release trade secrets." *Id.*  (citing *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589 (1978)).

On the other hand, where a request to seal documents relates to non-dispositive motions, courts may apply a "good cause" standard to sealing requests. *In re Midland Nat. Life Ins. Co. Annuity Sales Pracs. Litig.*, 686 F.3d 1115, 1119 (9th Cir. 2012);  *In re Seagate Tech. LLC*, 326 F.R.D. 223, 246 (N.D. Cal. 2018) (recognizing good cause standard for non-dispositive motions but finding that the higher "compelling interest" standard applied because motion at issue in that case was "effectively" dispositive*); Dugan v. Lloyds TSB Bank, PLC*, No. 12-CV-02549-WHA NJV, 2013 WL 1435223, at *1 (N.D. Cal. Apr. 9, 2013) ("On non-dispositive motions, a party seeking to file under seal a document produced under seal in discovery only must establish there is 'good cause' for sealing the record.").  The good cause standard can be met with a "particularized

---

[1] The parties have consented to the jurisdiction of a United States magistrate judge pursuant to 28 U.S.C. § 636(c).

showing" that there is good cause to seal the material.  *In re Midland Nat. Life Ins. Co. Annuity Sales Pracs. Litig.*, 686 F.3d at 1119.

### B.    Docket Nos. 75 and 79

In docket no. 75, Plaintiff asks the Court to seal documents designated as confidential by SFEI that she filed in support of her Motion to Compel Phone Records.  The proposed order supplied by Plaintiff does not specifically identify the material to be sealed, as required by the Local Rules, but the Court understands this motion to apply to some portions of Exhibits D, E and F to Ma's supporting declaration, dkt. no. 75-1.  The exhibits attached to Ma's declaration appear to redact only names and email addresses but Plaintiff did not attach the unredacted exhibits so this cannot be confirmed.  Furthermore, Ma's declaration describes the material to be sealed more broadly.  *See* dkt. no.75-1 at ECF p. 2.  Thus, it is not entirely clear from the motion the specific material Plaintiff is asking the Court to seal.  For this reason, this motion is DENIED.

Rather than responding to Plaintiff's motion, as required under Rule 79-5(f)(3), SFEI filed its own sealing motion. *See* dkt. no. 79.  In it, SFEI asked the Court to seal portions of exhibits D, E, and F to the Ma Declaration (the same exhibits that were the subject of Ma's motion in docket no. 75). It is not clear whether SFEI found Ma's redactions of these documents in support of docket no. 75 to be sufficient.  SFEI asked that the Court allow the following material to remain under seal:

- Exhibit D: Any reference to Dan's personal email address and last name and Lisa Hunt's mobile phone number.
- Exhibit E: Any reference to Dan's personal email address and last name and Lisa Hunt's mobile phone number.
- Exhibit F: Any reference to Tyler's last name and compensation

Dkt. no. 79 at ECF p. 2.  As these documents were filed in support of a non-dispositive motion, the Court applies the good cause standard discussed above to this motion. Based on the privacy interests of Dan and Lisa Hunt the Court finds that there is good cause to seal this material. Therefore, the Court GRANTS this motion.  **It is Plaintiff's responsibility to file docket no. 75-1, redacted consistent with this Order, in the public record.  In the meantime, that document**

United States District Court
Northern District of California

3

**shall remain under seal.**

###### C.      Docket Nos. 80 and 82

Docket nos. 80 and 82 follow the same pattern.  In docket no. 80, Plaintiff filed a motion to seal in connection with her Motion to Compel Production of Communications Regarding Lisa Hunt's Hiring based on SFEI's confidentiality designations.  In docket no. 82, SFEI filed a counter-motion instead of a response to Plaintiff's motion.  Plaintiff's motion is extremely broad, apparently asking the Court to seal the entire motion and all supporting evidence pending SFEI's response rather than providing documents that redact only the material that was designated as confidential.  Therefore, that motion is DENIED.

SFEI's sealing motion (docket no. 82) asks the Court to seal portions of Exhibits E, F, and G to the Ma Declaration in support of docket no. 80, namely:

- Exhibit E:  Any reference to Lindsay's last name and Lisa Hunt's cell phone number.

- Exhibit F: Any reference to Lindsay's last name and David Senn's cell phone number.

- Exhibit G: Any reference to Lindsay's last name.

Dkt. no. 82 at ECF p. 2. [2]  The Court applies the good cause standard because this material was offered in connection with a non-dispositive motion.  The Court further finds that this standard is met based on the privacy interests of the named individuals.  Accordingly, the Court GRANTS this motion.  **It is Plaintiff's responsibility to refile docket no. 80-1, redacted consistent with this Order, in the public record.  In the meantime, that document shall remain under seal.**

###### D.      Docket No. 89

In docket no. 89, SFEI brings a motion to seal parts of Ex. D to Ma's Reply on her motion to compel production of communications related to Lisa Hunt. In particular, it asks the Court to

---

[2] In SFEI's motion, it describes in narrative form the material it seeks to have sealed in Exhibits E, F. and G, followed by a summary that describes the material that should remain under seal in these exhibits.  The summary, however, refers to "Exhibit E . . . . ; Exhibit E . . . ;[and] Exhibit F."  Dkt. no. 82 at ECF p. 2.  Based on the narrative description that precedes this summary, the Court presumes that SFEI meant to refer to Exhibits E, F and G.

United States District Court
Northern District of California

seal portions of the exhibit that were designated as confidential and that include personal information of other applicants.  Plaintiff filed her reply brief and supporting exhibits (docket no. 88) in the public record after the Court had denied her motion; the Court limited access to the documents after SFEI filed its sealing motion.   The Court finds that there is good cause to seal this material based on the privacy interests of the individuals named in these materials and therefore this motion is GRANTED.   **It is Plaintiff's responsibility to refile a redacted version of docket no. 88 consistent with this Order.  In the meantime, the Court will maintain docket no. 88 under seal.**

### E.     Docket No. 98

In docket no. 98, SFEI asks the Court to seal portions of exhibits offered in support of its summary judgment motion on the basis of the privacy interests of non-parties whose personal information is disclosed in the documents. Because this material was submitted in connection with a dispositive motion, the compelling interest standard applies.  The material SFEI seeks to seal in this motion includes personal information of non-litigants and candid evaluations of other applicants' qualifications for the position Plaintiff sought. The Court finds that its disclosure would violate the privacy interests of these individuals .  Furthermore, the Court finds that while there is a public interest in certain general information about the qualifications of the candidates SFEI considered, the material SFEI seeks to seal relating to these individuals has little or no bearing on the Court's rulings on summary judgment and therefore, that the reasons for the Court's rulings can be understood by the public even without access to this specific private information.  Therefore, the Court finds that there is a compelling interest in maintaining the confidentiality of this material.  However, the proposed order supplied by SFEI does not "list[ ] in table format each document or portion thereof that is sought to be sealed." Civ. L.R. 79-5(c)(3). Therefore, this motion is DENIED without prejudice.  SFEI is instructed to refile the motion with a proposed order that complies with Civil Local Rule 79-5.  In the meantime, these documents will remain under seal.

### F.     Docket Nos. 108 and 112

In docket no. 108, Plaintiff has refiled her motion to seal portions of exhibits filed in

support of her opposition to SFEI's summary judgment motion, originally filed in the public record as dkt. no. 103,[3] in response to the Court's October 16, 2025 Order, dkt. no. 107. Plaintiff complied with the Court's instructions with respect to how her sealing motion should be filed, including providing a list in table format of the material sought to be sealed.  As Plaintiff seeks to seal only the last names of non-party job applicants who have a privacy interest in information related to their applications for employment with SFEI, the Court finds that there is a compelling interest that justifies sealing the material identified in this motion for the reasons discussed above. Therefore, this motion is GRANTED.

In docket no. 112, SFEI brings a motion to seal last names and other personal information of non-party job applicants in Plaintiff's summary judgment opposition and exhibits that Plaintiff failed to redact and did not seek to seal in docket no. 108.   SFEI provides a detailed proposed order in compliance with Civil Local Rule 79-5(c)(3).  The Court finds that there is a compelling interest that justifies sealing the material identified in this motion for the reasons discussed above. Therefore, this motion is GRANTED.  **It is Plaintiff's responsibility to refile a redacted version of docket no. 103 consistent with this Order, that is, redacting all of the confidential material identified in docket nos. 108 and 112.**  In the meantime, the Court will maintain docket no. 103 under seal.

III.    **SANCTIONS MOTION**

SFEI asks the Court to award sanctions in the amount of $3,500 pursuant to Rule 37 of the Federal Rules of Civil Procedure based on Plaintiff's filing in the public record of material designated as confidential by SFEI, without following the procedures set forth in the stipulated protective order in this case (docket no. 51).  The Court GRANTS in part the Sanctions Motion.

Rule 37 "grants courts the authority to impose sanctions where a party has violated a discovery order, including a protective order issued pursuant to Rule 26(f)." *Life Tech. Corp. v. Biosearch Tech., Inc.*, No. C-12-00852 WHA (JCS), 2012 WL 1600393, at *8 (N.D. Cal. May 7, 2012). The violation need not be willful, unless the sanction is dismissal; even a negligent

---

[3] The Court restricted access to the document when it became aware that it contained material designated by SFEI as confidential.

United States District Court
Northern District of California

violation may warrant the imposition of sanctions. *Lew v. Kona Hosp.*, 754 F.2d 1420, 1426-27 (9th Cir. 1985). Whether to impose sanctions is "left to the sound discretion of the trial judge." *Von Brimer v. Whirlpool Corp.*, 536 F.2d 838, 844 (9th Cir. 1976).

Plaintiff's summary judgment opposition brief, supporting declaration and exhibits contain a great deal of material designated as confidential by SFEI, including the last names and email addresses of non-party job candidates, the impressions of SFEI interviewers about the candidates, and salary information. *See generally* dkt. no. 103. Plaintiff filed all of her Opposition papers in the public record, notwithstanding the clear prohibition on doing so in Section 12.3 of the Stipulated Protective Order, stating that "[w]ithout written permission from the Designating Party or a court order secured after appropriate notice to all interested persons, a Party may not file in the public record in this action any Protected Material." Docket no. 51 at ECF pp. 10-11. This section goes on to make clear that where a party files material designated as confidential by the other side they must comply with Civil Local Rule 79-5.

Plaintiff claims that she "acted in good faith as a pro se litigant confused about complex sealing requirements" and asserts she should not be subject to monetary sanctions because "she immediately took corrective action when the Court clarified the requirements" and SFEI suffered no prejudice. Dkt. no. 115 at ECF p. 2. She further blames SFEI for causing confusion by "designating virtually every discovery document as 'Confidential.'" *Id.* However, she does not dispute that SFEI's counsel contacted her *before* filing the Sanctions Motion and asked her to withdraw and refile the improper filing. *See* dkt. no. 106-2 (Cardenas Decl.) ¶ 4 & Ex. B. Nor does she offer any explanation for failing to respond to that communication or refile her Opposition papers properly.

Although Plaintiff is proceeding pro se, she has previously filed sealing motions pursuant to Civil Local Rule 79-5, *see* dkt. nos. 54, 80, indicating that she understands that confidential materials are subject to that rule. At the same time, this is not the first occasion upon which she has filed material designated as confidential in the public record. In particular, Plaintiff previously filed in the public record a document that was designated as confidential in support of a reply brief on one of her motions to compel – a violation that was flagged by SFEI in a previous sanctions

motion. *See* dkt. no. 92-1 at ECF pp. 3-4. Although the Court did not award sanctions on that occasion, it cautioned Plaintiff that it expected her "to comply with the Court's standing orders, the Civil Local Rules of this Court and the Federal Rules of Civil Procedure." Dkt. no. 97.

In sum, the Court concludes that Plaintiff's filing in the public record of material designated by SFEI as confidential without following the procedures set forth in the Protective Order or Civil Local Rule 79-5 was a flagrant and deliberate violation of the Protective Order. Furthermore, her failure to respond to SFEI's demand that she withdraw and refile the material in compliance with the Protective Order and Rule 79-5 necessitated SFEI's Sanctions Motion. Therefore, the Court finds that an award of fees to compensate SFEI for the time spent addressing Plaintiff's discovery misconduct is warranted. *See Evon v. L. Offs. of Sidney Mickell*, 688 F.3d 1015, 1035 (9th Cir. 2012) (finding award of attorney's fees to be an appropriate sanction for deliberate failure to abide by protective order where defendant filed documents designated as confidential in the public record without sealing or redacting them).

SFEI's counsel has supplied a declaration stating that her hourly rate is $300/hour and that she spent 5 hours drafting the motion and supporting documents; in addition she anticipated spending 1 hour to review Plaintiff's opposition, 4.5 hours drafting a reply and .6 hours attending a motion hearing. The Court finds these times and rates to be reasonable except that it finds that the time estimated for the reply brief is somewhat high – the Court finds 3 hours to be a reasonable amount of time to review Plaintiff's Opposition and draft a reply brief – and also reduces the amount of the sanction to take into account the fact that the Sanctions Motion was decided without a hearing.[4] Accordingly, the Court awards $2,400 in attorneys' fees as a sanction

_____

[4] The Court notes that Cardenas states in her declaration:

> I have spent 5 hour[s] so far drafting this motion and supporting documents and have therefore incurred $1,500 in attorney's fees to date. I suspect that I will incur an additional $2,000 (6.6 hours) in reviewing Plaintiff's Opposition (1), drafting a Reply brief (4.5), and attending any hearing (.6). Accordingly, I suspect my total attorney's fees incurred will be $3,500.

Cardenas Decl. ¶ 6. There appear to be two computational errors in this statement. First, the time Cardenas anticipated spending reviewing the Opposition, drafting a Reply and attending a hearing adds up to 6.1 hours rather than 6.6 hours. Second, even if the anticipated time added up to 6.6 hours, the fees for that time at Cardenas's hourly rate would be $1,980 rather than $2000.

for Plaintiff's discovery misconduct.

## IV.    SUMMARY JUDGMENT MOTION

### G.    BACKGROUND

#### 1.    Factual Background[5]

Plaintiff Shufen Ma holds a Ph.D. in Oceanography from the University of Delaware. She describes her "fundamental research interests" as being "in the field of aquatic biogeochemistry." Declaration of Shufen Ma, dkt. no. 108-2 ("Ma Decl.") ¶ 2.  According to Ma, she has "obtained extensive experience in the development and application of voltammetric microelectrodes for the investigation of biogeochemical processes in fresh water, estuarine, marine, hydrothermal vent, and acid mine drainage biofilm systems." *Id.*

On August 3, 2014, Ma sent an email to David Senn, who has been Program Director of the Clean Water Program of Defendant SFEI since 2012, in which she inquired about employment opportunities with SFEI and told Senn that she had "obtained extensive experience in the development and application of in situ voltammetric microelectrodes for the investigation of biogeochemical processes in fresh water, estuarine, marine, hydrothermal vent, and acid mine drainage biofilm systems."  Declaration of David Senn in Support of Defendant's Motion for Summary Judgment or in the Alternative, Partial Summary Judgment, dkt. no. 99-5 ("Senn Decl."), Ex. B.  Senn responded the same day, observing that Ma had "done some really interesting work."  *Id.*  He told her, however, that "[w]hile [her] experience would certainly allow [her] to make substantial contributions, the bulk of [SFEI's] monitoring work would be using fairly basic/commercially-available sensor packages."  *Id.*

Ma met Senn in person in January 2015.  Ma Decl. ¶ 20; Senn Decl. ¶ 10.  According to Ma, "[d]uring this meeting, [she] explained that bottom waters were where nutrients cycling occurred and represented the critical zone for fish and benthic organisms" and she "recommended deploying sensors near the sediment-water interface to understand nutrients dynamics."  Ma Decl.

---

Notwithstanding these computational errors, the Court presumes that the underlying time estimates and Cardenas's hourly rate are accurate.
[5] The facts set forth below are undisputed unless otherwise stated.

United States District Court
Northern District of California

¶ 20.  Senn states that Ma showed up at his office without an appointment and that he "met with her to discuss SFEI and what SFEI was looking for in candidates for a position [it] had recently posted."  Senn Decl. ¶ 20.  He states that he "told Plaintiff during this in-person meeting that [SFEI was] specifically seeking candidates who were proficient in R Programming Language or Matlab and [that he] recall[s] Plaintiff telling [him] that she did not have a lot of experience in either during [their] discussion."  *Id.*

On March 3, 2016, Ma sent Senn "a detailed email proposing a research study to investigate nitrogen and phosphorus cycling at the oxic/anoxic interface."  Ma Decl. ¶ 21 & Ex. B.  Ma contends Senn "subsequently implemented the exact research projects [she] had recommended [to Senn], but hired other personnel to do the work." *Id.*  ¶ 22.

On September 10, 2021, SFEI posted a job announcement for an Environmental Scientist position.  Declaration of Lisa Hunt in Support of Defendant's Motion for Summary Judgment, or in the Alternative, Partial Summary Judgment,  dkt. no. 99-7 ("Hunt Decl."), ¶ 6 & Ex. C (job announcement).[6]  The announcement stated that the "major focus" of the position would be on "the analysis and interpretation of large, rich datasets (e.g., multi-year high-frequency mooring datasets; multi-decade monitoring program data) to gain mechanistic insights into ecosystem dynamics and/or to characterize status and trends in water quality indicators."  *Id.*

Lisa Hunt, who worked as a Program Manager/Senior Scientist for the San Francisco Bay Nutrient Management Strategy Project at SFEI between March 2021 and March 2022, "spearheaded hiring" for the Environmental Scientist position and was to be the direct supervisor of the individual hired for the position.  *Id.*  ¶ 2.  She states that she helped create the job announcement for the position with the help of SFEI's David Senn, Derek Roberts, Kristin Art, and Ariella Chelsky.  *Id.* ¶ 2.

---

[6]The job announcement explained that SFEI's Nutrient Management Strategy team was "recruiting for two closely-related positions" and that the positions were being advertised "in parallel" with the aim of "hir[ing] two outstanding individuals whose experience, skills, and scientific backgrounds [would] best augment and/or deepen the NMS' capacity within its technical focus areas."  *Id.*  Plaintiff applied for the Environmental Scientist position rather than the Associate Environmental Scientist Position, as did the other applicants discussed herein.  As that is the position upon which her claims are based, references to "the position" herein refer to the Environmental Scientist position unless otherwise stated.

United States District Court
Northern District of California

According to Hunt, the job announcement "listed the skillsets [Hunt] was looking for in hiring someone for the position[,]" listing the following "[d]esired [q]ualifications":

> Master's degree plus at least 7 years of experience or PhD (post-PhD experience desirable but not required). Relevant fields include environmental engineering, environmental science, oceanography, or another related scientific field.
>
> Strong quantitative background and data analysis skills using data analysis or statistical software (e.g., Python, R, Matlab).
>
> Experience applying those skills to interpret large datasets (high-frequency and/or multi-decade monitoring data) related to water quality
>
> Experience in biogeochemistry, hydrodynamics/physical oceanography, environmental chemistry biogeochemistry, and/or environmental science, including field work and report writing.
>
> Strong communication, presentation and writing skills and ability to synthesize information.
>
> Ability to work well in teams as well as work independently.

Hunt Decl., Ex. C (job announcement). The announcement further stated that the candidate should have "experience or expertise in some of the following areas":

> Experience with oceanographic instrumentation (e.g. CTD, ADCP, etc.), including deployment planning, calibration, and maintenance.
>
> Proficiency in statistical methods especially with respect to analyzing large data sets of high frequency time series data.
>
> Data visualization experience and skills.
>
> Experience with data management, quality assurance, and post-processing.
>
> Understanding of marine/estuarine biogeochemistry, hydrodynamics, ecology, and/or chemistry.
>
> Experience with technical project management, organizational skills, and ability to manage multiple projects at once and meet deadlines.
> Strong meeting facilitation skills and/or experience presenting to/engaging with stakeholder groups.

*Id.* Finally, it described the following "typical" duties for the position:

> Design observational and experimental studies to inform scientific and management questions and provide data needed for models, statistical analyses, and predictive tools.

11

> Analyze datasets using statistical software and open source code (e.g., Python, R suite).
>
> Synthesize data from multiple lines of evidence, including both observational and modeling studies, to address key nutrient management issues and develop recommendations for mitigating impacts.
>
> Write technical reports, journal articles, memoranda, and proposals. Depending on experience and interest, lead various types of field work using standard and innovative techniques, including instrument calibration and maintenance.
>
> Lead projects involving internal staff and external partners.
>
> Oversee and provide technical direction on verification/validation (QA/QC) of data.
>
> Develop presentations and/or posters for stakeholder meetings, public meetings and scientific conferences.

*Id.*

On September 9, 2021, Hunt asked Biruk Imagnu, a Technical Support Manager at SFEI, to assist in setting up "an application link and landing page for the Environmental Scientist position." Declaration of Biruk Imagnu in Support of Defendant's Motion For Summary Judgment or in the Alternative, Partial Summary Judgment, dkt. no. 99-4 ("Imagnu Decl."), ¶ 2; Hunt Decl., ¶ 3. In an email she sent to Imagnu on that date, Hunt stated:

> For the application questionnaire . . . . for the skills section include the following:
>
> Please rate your level of experience and proficiency with each of the following:
>
> • R Programming Language
> • Python
> • Matlab
> • Statistical analysis with high frequency/time series data sets
> • Water quality data analysis.
>
> Each of the above should include the following answer options:
>
> • Beginner
> • Intermediate
> • Advanced
> • No experience.

Hunt Decl., dkt. no. 99-7, ¶ 5 & Ex. B (email and questionnaire screenshots).

United States District Court
Northern District of California

Hunt states in her declaration that she "was looking to hire someone with at least intermediate-level (if not advance) proficiency and experience in at least one of the three programming languages (R Programming Language, Python, Matlab), as SFEI's employees used these programming languages in data analysis and modeling in 2021." *Id.* ¶ 5. She explained:

> I thought that if a candidate had already mastered one programming language, then, they could more easily master the use of the other two programming languages. I was not looking to hire someone who had only beginner proficiency and experience or no experience at all in all three programming languages as I believed it would take that person a long time to learn how to code in those three programming languages. As a result, it would make it much more difficult for that person to be a valuable contributor at SFEI and efficiently learn and perform their job duties in the Environmental Scientist position, which I would be directly supervising.

*Id.*

Imagnu states that in setting up the online application for the position, he created "a Smartsheet with columns for standard questions (name, email, phone number, highest level of education, etc.) along with Lisa Hunt's screening questionnaire which contained five questions, and [he] added a file upload option for the applicant's CVs and cover letters." Imagnu Decl., ¶ 2. According to Imagnu, he "used Smartsheet's features to create a digital form which corresponded to the various columns in the Smartsheet, so that applicants could fill out the application questions, including the screening questionnaire and upload the cover letters and CVs on the landing page, and it would auto populate on the Smartsheet." *Id.* He "granted access to the Smartsheet to Lisa Hunt, and whoever else Lisa Hunt asked that [he] provide access to within the hiring team." *Id.*

Imagnu also created a link – which appeared only after the applicant "completed and submitted the Smartsheet digital form on the application landing page (thereby submit[ing] their application materials for the position) – to a survey regarding their demographic information. *Id.* ¶ 3. Imagnu explains:

> [This was] a separate, pre-existing Google survey which collected the data using Google forms, which was linked to a separate and pre-existing Google spreadsheet, for the demographic information sought from the applicants. This information auto populated on this separate Google spreadsheet (not the Smartsheet containing the applicant's cover letters, CVs and responses to the screening questionnaire) and access was restricted to this Google spreadsheet to only Jen Trudeau,

13

members of the administrative team and SFEI's HR consultant.

*Id.*

The job announcement included a statement that SFEI is an Equal Opportunity employer, stating:

> SFEI is committed to building a culturally diverse staff, and we strongly encourage applications from women, people of color, and other groups commonly under represented in environmental science.
>
> San Francisco Estuary Institute is an Equal Opportunity /Affirmative Action employer and prohibits discrimination and harassment of any kind. We are committed to the principle of equal employment opportunity, and to providing employees with a work environment free of discrimination and harassment. All employment decisions are based on business needs, job requirements, and individual qualifications. Qualified applicants will receive consideration for employment without regard to race, color, religion, sex, including sexual orientation, gender identity or expression, national origin, physical or mental disability, family or parental status, protected Veteran status, or any other characteristic protected by applicable federal, state, or local law.

Hunt Decl., Ex. C.

SFEI contends its "workforce is diverse[,]" offering evidence that "in 2021 (when Plaintiff applied), 9 out of the 76 employees were Asian (11.8%), 40 out of the 76 employees were age forty or older (52%), 26 out of the 76 employees were fifty years old or older (34%)[,] . . 12 out of the 76 employees were sixty years old or older (15%)[,]" and three SFEI employees were "in their seventies . . ., with the oldest employee being 73 years old." "  Motion at 7 (citing Declaration of Jen Trudeau in Support of Defendant's Motion for Summary Judgment, or in the Alternative, Partial Summary Judgment, dkt. no. 99-6 ("Trudeau Decl."), ¶ 2 & Ex. A). This data was collected by SFEI's Managing Director, Jen Trudeau, as part of SFEI's Equal Employment Opportunity obligations arising from the fact that it "contracted with the federal government and was required to submit annual EEO-1 data to the United States Equal Employment Opportunity Commission." Trudeau Decl., ¶ 2.

Ultimately, in December 2021, SFEI hired Dan[7] for the Environmental Scientist position.

---

[7] Because the record contains private information about the candidates who applied for the position, the Court refers to them only by their first names.

Hunt Decl. ¶ 57.  SFEI also made an offer to Tyler but when Tyler declined the offer, SFEI decided not to hire a second person for the position.  Senn Decl. ¶ 8. Lisa Hunt conducted the initial screening of the applications and worked with David Senn, Derek Roberts, Kristin Art, and Ariella Chelsky to come up with a list of candidates for an initial screening interview to be conducted by Hunt.  *Id.*  ¶¶ 35-36.  On October 7, 2021 (before Plaintiff applied for the position), Hunt sent an email to Senn, Roberts, Art and Chelsky reporting on the telephone screening interviews she had conducted the previous week and seeking feedback as to which candidates should be invited for first round of interviews.  *Id.* Ex. P (October 7, 2021 email).

The six candidates who underwent screening interviews in this initial round were Sameen, Adrienne, Nazanin, Tyler, Dan and Famina.  *Id.* Among other things, Hunt asked all of these candidates to "[d]escribe [their] training, experience and skills with data analysis, especially with high frequency data sets. Include your proficiency with programming and stats tools."  *Id.*, Ex. Q. She noted in her October 7, 2021 email that "[a]ll 6 candidates seem[ed] to have reasonably strong programming skills, but generally in R or Matlab rather than python."  *Id.*, Ex. P;  *see also*  Ex. Q, dkt. no. 98-6, ECF pp. 207-214 (Hunt screening interview notes). Likewise, the data on the Smartsheet reflects that all six candidates rated themselves as Advanced or Intermediate in at least one programming language in their responses to the application questionnaire.  *See* Hunt Decl., Ex. D (Smartsheet); *see also* Hunt Decl. ¶ 17 ("I selected only those candidates who rated their experience as Advance or Intermediate in at least one programming language (R Programming Language, Matlab, Python) in their screening questionnaire to advance to the screening interview round."). The same is true of two other applicants who applied on October 11, 2021 (Farnaz) and October 22, 2021 (Lindsey) and participated in screening interviews.  *Id.*, Ex. D.

In her October 7, 2021 email, Hunt found that "[a]lthough all 6 of the candidates appear[ed] to have strong quantitative skills as well as programming skills, only half of them (Adrianne Tyler and Dan) appear[ed] to have the kind of statistical data analysis training and skills that [Hunt thought was] needed if they [were] to take a lead role on some of [SFEI's] data synthesis projects."  *Id.,* Ex. R. Hunt proposed that these three candidates be invited for a first-round interview but noted that applications were "still coming in" and that she would "continue to

screen applicants for the next couple of weeks." *Id.* After reviewing feedback from colleagues, Hunt sent an email on October 12, 2021 stating that she would schedule interviews with Adrienne, Tyler and Dan. *Id.* Ex. S.

The next day, on October 13, 2021, Plaintiff filed her application for the Environmental Scientist position. *Id.* ¶ 41 & Ex. D. According to Hunt, she reviewed Plaintiff's cover letter and CV on October 14, 2021, when she first saw the application, and "learned that Plaintiff had a PhD in Oceanography but that her last postdoctoral research position ended in 2013 (approximately 8 years prior) and that she had been working as an adjunct professor at Berkeley City College since 2011." *Id.* ¶ 41 & Ex. T. She notes that in Plaintiff's CV and cover letter, there was no mention of Plaintiff "having any experience with Matlab, R Programming Language or Python." *Id.* The Smartsheet reflects that Plaintiff rated herself as "Beginner" in all three programming languages (Python, R and Matlab). *Id.* Ex. D.

According to Hunt, on October 14, 2021 she noted in the "con" column of the Smartsheet as to Plaintiff's application: "doesn't appear to have the data analysis skills we are looking for, or PM experience." *Id.* Ex. U. In the "initial interview" column, Hunt wrote "no." *Id.* An activity log for the Smartsheet reflects that Hunt's comment in the "con" column was added on October 14, 2021 and was deleted by David Senn when he accessed the Smartsheet on October 28, 2022, long after the position had been filled. *See generally* Declaration of Tony Hale in Support of Defendant's Motion for Summary Judgment or in the Alternative, Partial Summary Judgment, dkt. no. 99-8 ("Hale Decl."); *see also* Hunt Decl. ¶ 43; Senn Decl. ¶ 11 & Ex. C. The Court has already concluded that the deletion was inadvertent. *See* dkt. no. 87. The activity log also reflects that October 28, 2022 was the first time Senn downloaded Plaintiff's application materials. Hale Decl.; Senn Decl., Ex. C.

Hunt states in her declaration that prior to reviewing Plaintiff's application, she "had never heard of Plaintiff." Hunt Decl. ¶44. She states further:

> I do not know Plaintiff and have never seen or met Plaintiff and do not have any specific recollection of her applying for the Environmental Scientist position in October 2021. To the best of my memory, at no point during my employment with SFEI did David Senn mention anything to me about Plaintiff.

16

United States District Court
Northern District of California

*Id.* Similarly, Senn states that he was "not involved in the decision on whether Plaintiff would advance to the screening interview round." Senn Decl. ¶¶ 4, 6. Nor was he even aware that Ma had applied for the position in 2021, according to Senn. *Id.* ¶ 4. Senn states that "Lisa Hunt did not alert [him] that Plaintiff had applied for the position" and he "never told Lisa Hunt anything about Plaintiff during Lisa Hunt's employment." *Id.* Nor is there any evidence in the record that Hunt consulted with anyone involved in hiring for the Environmental Scientist position in connection with her decision not to advance Ma to the screening interview stage of the process.

According to Hunt, she also "did not know Plaintiff's or the other applicants' race, national origin, or age when [she] was hiring for the Environmental Scientist position in 2021" and "[i]f a candidate listed their date of graduation from undergraduate school or graduate school on their CV or cover letter, [she] did not make assumptions about a person's age as [she knew] that not everyone starts undergraduate school at 18 years old." *Id.* ¶ 45.

Hunt also states in her declaration that Ma's data analysis software skills and her experience with voltametric microelectrodes were not the "skillset" SFEI was looking for in candidates for the Environmental Scientist position:

> 60. The fact that Plaintiff supposedly had experience with other software to perform data analysis did not make Plaintiff qualified for the position as we were specifically seeking candidates who had at least intermediate if not advanced level proficiency and experience in one of the three programming languages that SFEI already used (i.e., R Programming Language, Matlab, Python).
>
> 61. Similarly, the fact that Plaintiff supposedly had experience with "cutting-edge voltametric microelectrodes," was not important as we were not seeking candidates with that experience or skillset. Notably, in 2021 and 2022, SFEI used basic/commercial-available sensor packages, which were far from the "cutting-edge voltametric microelectrodes," Plaintiff had experience using.

Hunt Decl. ¶¶ 60-61.

In the meantime, interviews by the hiring team of the leading candidates proceeded. *Id.* ¶¶ 48-57. Hunt and her colleagues conducted first-round interviews of Tyler, Lindsay, Dan, Farnaz, and Adrianne. *Id.* ¶ 48 & Ex. X (interview notes). On October 19, 2021, Hunt emailed the individuals who would be conducting the interviews to provide standardized questions that were to be asked of all of the candidates to "make sure [they were] giving all candidates the same

opportunities to respond." *Id.* Ex. W. She noted that two of the questions were "new ones [she] created that [were] focused on data analysis." *Id.* In a separate email, dated October 18, 2021, she requested guidance from Jen Trueau about 'questions [the interviewers] should NOT be asking candidates. Things like 'where are you from?' or 'do you have any kids?' or other conversational questions that are not job-related." *Id.* Ex. V. Trudeau responded, "[y]ou have the right sentiment. Avoid personal questions as you noted. Avoid questions about marital status, country of origin, family status etc." *Id.*

All five candidates were then advanced to a second round of interviews, in which each candidate would give a presentation. *Id.* ¶ 50. However, Adrianne declined SFEI's invitation for a second-round interview, telling Hunt via email that she did not "think this position [was] a perfect fit for [her] right now at this stage in [her] career." *Id.* ¶ 51 & Ex. AA, dkt. no. 98-6 at ECF p. 295.

On November 9, 2021, Hunt asked those who had conducted interviews of the four candidates who returned for second-round interviews (Tyler, Dan, Lindsey and Farnaz) to complete a survey describing their impressions of them. *Id.* Ex. BB (November 9, 2021 email). She cautioned the recipients that "[t]he idea behind the survey is to get independent input from everyone to avoid 'group think' so please don't look at other responses before completing your survey." *Id.* SFEI has offered the survey results as an exhibit. *See id.*, Ex. CC. The survey results reflect that multiple interviewers commented on Dan and Tyler's strong data analysis skills as "pros" in favor of hiring them. *Id.*, dkt. no. 98-6 at ECF pp. 304-305.

Senn states in his declaration that "[a]fter the second-round interview, our interview team decided that Dan and Tyler were the top candidates, and we were considering hiring both." Senn Decl. ¶ 7. Thus, Senn "met with Tyler and Dan separately to better understand their interest and experience with field instrumentation and their technical skills and depth." *Id.* He states:

> From that third interview, I decided Dan was the stronger of the two in terms of data analysis and interpretation and Dan had less hands-on experience with field instruments. Dan also told me during this interview that it was his preference not to have a major fieldwork role (although he expressed that he was willing to manage the program). I also learned from speaking with Tyler that Tyler was very interested in fieldwork, had a lot of experience with field instrumentation, and

18

> wanted substantial fieldwork to be part of his next job, while also being strong in the areas of data analysis, statistics and coding.

Senn Decl. ¶ 7.

Dan was offered the position in December 2021 and he accepted the offer. *Id.* ¶¶ 56-57. The Smartsheet reflects that he rated his abilities as "beginner" in Python and Matlab but advanced as to R Programming. *Id.* Ex. D. Hunt and David Senn also decided to offer a second Environmental Scientist position to Tyler but Tyler informed Hunt that he had decided the position would not "be the best fit" for him before a formal offer was extended to him. *Id.* ¶ 59 & Ex. II. In his application, Tyler described himself as "Advanced" in R Programming, "Beginner" in Python and "Intermediate" in Matlab. *Id.*, Ex. D.

### 2. The Motion

In the Motion, SFEI asserts that under the *McDonnell Douglas* burden shifting framework, it is entitled to summary judgment on Plaintiff's discrimination claims under Title VII and the ADEA because the undisputed facts establish that Plaintiff was not qualified for the position and therefore, she cannot make a prima facie case of discrimination based on SFEI's failure to hire her. Motion at 22. In particular, it contends, while Plaintiff believes she was qualified for the position based on her "extensive experience with 'advanced software provided by the manufacturer' (but admittedly not with R Programming Language, Python or Matlab) and 'cutting-edge voltametric microelectrodes[,]' . . . it is undisputed that [SFEI] was not looking for these skillsets when hiring for the Environmental Scientist position." *Id.* (citing Cardenas Decl. ¶ 2 & Ex. A. (Pl. Depo. 77:5-18; 78:17-79:15; 104:1-4, 138:5-11); *id.* ¶ 3 & Ex. B (Resp. RFAs Nos. 10-13); Dkt. no. 30 (SAC) ¶¶ 71, 74-74, 77-78; Hunt Decl.¶¶ 60,61). According to SFEI, "Plaintiff's subjective personal judgments of her competence alone does not raise a genuine issue of material fact." *Id.* (citing *Bradley v. Harcourt, Brace & Co.*, 104 F.3d 267, 270 (9th Cir. 1996); *De Markoff v. Superior Ct. of California*, 2014 WL 2895200, at *6 (E.D. Cal. June 25, 2014)).

SFEI further asserts that Plaintiff cannot establish discrimination because the undisputed facts establish that Lisa Hunt – the decision-maker who decided not to advance Ma's application to a screening interview – "did not know Plaintiff's or the other candidates' age, race or national

19

origin." *Id.* at 26-27. According to SFEI, the fact that Hunt was aware of Ma's year of graduation and that she attended school in China is not sufficient to establish that Hunt had "actual knowledge" that Ma was in a protected group. *Id.*

SFEI argues that Plaintiff cannot prevail on her discrimination claims for the additional reason that it has articulated a legitimate, non-discriminatory for rejecting her application, namely, that Plaintiff had no experience with any of the three programming languages (R Programming, Metlab and Python) listed in the application questionnaire and therefore did not have the "data analysis skills [SFEI was looking for[.]" *Id.* at 27-28. Furthermore, SFEI asserts, Plaintiff cannot "produce sufficient evidence to raise a genuine issue of material fact as to whether the employer's proffered nondiscriminatory reason is merely a pretext for discrimination." *Id.* at 28 (citing *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1282 (9th Cir. 2000)). To establish pretext, SFEI contends, Plaintiff must point to "specific and substantial evidence" that SFEI's failure to hire her was motivated by discriminatory intent but Plaintiff cannot do so. *Id.* at 28-30.

According to SFEI, Plaintiff cannot rebut the evidence that Hunt decided not to move Ma's application to the screening interview stage because she did not have the data analysis skills SFEI was looking for; nor can she rebut SFEI's evidence that the successful candidates *did* have those skills and SFEI's hiring decision was based, in part, on that fact. *Id.* at 28-29. SFEI argues that it is not enough that it offered the position to "two seemingly white men of different national origin than her, who were younger than her" as she has pointed to no evidence of discriminatory intent on Lisa Hunt's part and speculation as to her motivation is not sufficient to rebut the legitimate, non-discriminatory reason SFEI has offered. *Id.* at 29-30. Likewise, SFEI contends, Plaintiff's suggestion that Senn "was somehow involved in the decision on whether she should advance to the screening interview round" is supported by no evidence. *Id.* at 30. Nor is there any evidence that Senn harbored any discriminatory animus toward Plaintiff, according to SFEI. *Id.*

### 3. Opposition

In her Opposition brief, Plaintiff asserts that there is evidence sufficient to create material issues of fact with respect to her discrimination claims based on a "multi-year pattern of institutional discrimination, predetermined candidate selection, and even evidence tampering

20

during litigation." Opposition at 4.

Plaintiff contends she has "superior qualifications," citing her experience "analyz[ing] large data sets for biogeochemical research about water quality and [her] proven records supported by her 16 peer-reviewed publications demonstrating expertise in nutrient biogeochemistry, water quality analysis, and estuarine ecosystem science that her research solved real environmental water quality problems." *Id.* (citing Ma Decl., ¶¶ 1-19 & Ex. A).

Plaintiff offers evidence that after she sent an email to Senn, on March 3, 2016,  in which she "propos[ed] a detailed research study to investigate nitrogen and phosphorus cycling at the oxic/anoxic interface using her cutting-edge voltammetric microelectrode expertise[,]" Senn forwarded the email to Phil and Emily, "acknowledging Plaintiff's 'deep skillset' and expertise with microelectrodes for redox chemistry from her PhD work, but stat[ing] 'it hasn't seemed like a good match for our goals.'" *Id.* at 5 (citing Ma Decl., Ex. B).  Ma contends the email "revealed that none of them understood how to investigate nutrient biogeochemistry." *Id.*  In particular, she says, "Senn admitted preferring to focus on 'imperfect' water column chemistry rather than utilize Plaintiff's expertise for accurate sediment-water interface measurements [and] Phil's response demonstrated fundamental misunderstanding of nutrient dynamics, stating 'there's rarely if ever anything close to a shortage of nutrients that would need to be alleviated.'" *Id.*

According to Plaintiff, despite rejecting her research proposal, SFEI "subsequently implemented the exact research projects Plaintiff had proposed, hiring others to do the work." *Id.* at 5-7. However, Plaintiff asserts, Senn and SFEI did not use Plaintiff's "voltammetric technology to accurately detect hypoxic zones and measure the oxic/anoxic interface, [and therefore] Defendant's team could not accurately measure denitrification rates or calculate nitrogen removal in San Francisco Estuary -- resulting in the 'imperfect' work Senn preferred over hiring Plaintiff to conduct accurate investigations." *Id.* at 7.

Plaintiff also contends SFEI engaged in a "pattern of discriminatory communications between 2015 and 2021" citing "[e]mails dating back to 2015 [that] reveal dismissive and biased assessments of Plaintiff's qualifications." *Id.*  at 7-8.  She cites emails by Senn and Emily and another by Phil in which Plaintiff's qualifications were discussed.  *Id.*

21

Plaintiff also asserts that Lisa Hunt was unqualified to screen the applications for the Environmental Scientist position and that she had a conflict of interest as to Plaintiff because Hunt and Plaintiff had been a "direct competitor" for a Program Manager/Senior Scientist position at SFEI advertised in January 2021 for which both had applied. *Id.* at 8-9. According to Plaintiff, "[o]ther hiring committee members deliberately avoided reviewing Plaintiff's application materials, maintaining plausible deniability because interview selection was predetermined." *Id.* at 9-10. She also accuses Hunt of litigation misconduct based on the allegation that Hunt "submitted a false declaration stating they only offered the job to Dan, contradicting evidence that Tyler was also offered the position." *Id.* at 10.

Plaintiff further contends SFEI "repeatedly hired candidates with no relevant water quality and nutrients biogeochemistry expertise" and that neither Dan nor Tyler had "any water quality and nutrients biogeochemistry expertise." *Id.* In fact, Plaintiff contends, Dan and Tyler lied when they completed the screening questionnaire when "Dan rated his water quality data analysis experience as Advanced [and] Tyler rated his water quality data analysis experience as Intermediate." *Id.* According to Plaintiff, "[i]n Defendant's Response to Plaintiff's First Set of Requests for Admission No. 28 and No. 32, Defendant admitted that Tyler and Dan 'did not have this experience but denies that this was a critical skillset or even a desired qualification for the for the Environmental Scientist position.'" *Id.* Plaintiff further asserts that "the questionnaire was manipulated to exclude Plaintiff" because while the "two desired qualifications for the Environmental Scientist position" identified by SFEI in its interrogatory responses were '[s]trong quantitative background and data analysis skills using data analysis or statistical software (e.g., Python, R, Matlab),' and '[e]xperience applying those skills to interpret large datasets related to water quality[,]' Dan and Tyler's self-rated proficiency in statistical software [was] meaningless when they admittedly lack water quality research experience -- the fundamental requirement for meaningful data analysis in this field." *Id.* (citing Ma Decl., Ex. O at 19). Plaintiff also criticizes the qualifications of other individuals hired by SFEI between 2016 and 2019. *Id.* at 11-13.

Plaintiff also contends emails about the applicants for the Environmental Scientist position indicate that the selection process was "predetermined" because "key decision-makers endorsed

United States District Court
Northern District of California

specific candidates prior to the conclusion of interviews, despite acknowledging serious weaknesses in those candidates' experience." *Id.* at 13-16. Furthermore, she asserts that Senn's deletion of Hunt's comment on the Smartsheet was deliberate and "revealed Hunt's discriminatory double standard: Hunt criticized Plaintiff for lacking 'data analysis skills we are looking for, or PM experience,' yet Hunt herself lacked expertise to evaluate nutrient biogeochemistry data analysis skills, and Dan and Tyler also lacked PM experience." *Id.* at 17.

Plaintiff asserts that the declinations of offers for the Environmental Scientist position by Tyler and Adrianne "reveal that even Defendant's chosen candidates recognized the poor fit between their qualifications and the position requirements." *Id.* at 17-18. According to Plaintiff, "[t]hese declinations demonstrate that Defendant's evaluation criteria were fundamentally flawed and pretextual." *Id.* at 18. In particular, she asserts that "[i]f the candidates Defendant preferred over Plaintiff recognized their own unsuitability, Defendant's justification for rejecting Plaintiff -- who possessed directly relevant expertise in nutrient biogeochemistry and water quality, is exposed as discriminatory pretext rather than legitimate business judgment." *Id.*

### 4. Reply

In its Reply brief, SFEI reiterates its assertions that Plaintiff has not established a prima facie case of discrimination and cannot establish that the non-discriminatory reason it has offered for declining to offer a position to Plaintiff was pretextual. As a preliminary matter, SFEI contends many of Plaintiff's assertions of fact are based on her own declaration, which it contends contains inadmissible evidence. Reply at 6-7 (citing examples). SFEI further asserts that Plaintiff has failed to establish a prima facie case of discrimination because she offers no "evidence reflecting Plaintiff's age, race and national origin, and the age, race, and national origin of the successful candidate Dan and the other candidate whom Defendant was considering offering the position, Tyler." *Id.* at 8. Nor does Plaintiff offer any evidence to controvert SFEI's assertion that she was "not qualified for the Environmental Scientist position because [she] did not have at least intermediate level proficiency and experience in at least one of the three programming languages[,]" SFEI asserts. *Id.* at 8-10.

SFEI argues that because Plaintiff has pointed to no direct evidence of discriminatory

23

intent on Hunt's part, she must provide "specific and substantial evidence that [Hunt's] proffered explanation is unworthy of credence because it is inconsistent or otherwise not believable" but that she has not done so. *Id.* at 12. According to SFEI, to the extent Plaintiff believes that SFEI "*should* have had someone with a background in water quality or nutrients biogeochemistry evaluate applicants and *should* have prioritized applicants with water quality and nutrients biogeochemistry experience, as opposed to candidates who were proficient in one of the three programming languages with experience in other scientific backgrounds," that does not establish pretext because "Title VII does not ensure the best will be selected—only that the selection process will be free from impermissible discrimination." *Id.* at 11 (quoting *Casillas v. U.S. Navy*, 735 F.2d 338, 344 (9th Cir. 1984) (emphasis in original)).

SFEI also notes that Plaintiff does not dispute that Senn "was **not involved in the decision** on whether Plaintiff would advance to the screening interview round in relation to Plaintiff's October 13, 2021 application or **that he was not even aware that she had applied for the position in 2021.**" *Id.* at 14 (emphasis in original). It further contends Plaintiff's allegation that SFEI "strategically placed [Hunt], who had been Plaintiff's direct competitor for the January 2021 Program Manager/Senior Scientist position, into a decision-making role for evaluating Plaintiff's application in October 2021 to create 'plausible deniability,' that the other hiring committee members reviewed Plaintiff's application[ ]" is "far-fetched[,]" "conclusory" and lacking any evidentiary support. *Id.* at 14.

SFEI asserts that Plaintiff has offered no evidence in support of her assertion that Dan and Tyler lied in their screening questionnaires when Dan rated his proficiency and experience with "water quality data analysis" as "Advanced," and Tyler rating his experience as "Intermediate." *Id.* Instead, it contends Plaintiff misrepresented its responses to her requests for admissions on this issue:

> Plaintiff misrepresents what her Request for Admission Nos. 28 and 32 asked Defendant to admit (i.e., that Dan and Tyler, respectively, "did not have estuarine water quality research experience")—which is markedly different than what they were asked in their screening questionnaire ("water quality data analysis"). Accordingly, Defendant denied these Request for Admissions, while making clear that estuarine water quality research experience was neither a critical

24

skillset nor a desired qualification for the Environmental Scientist position.

*Id.* at 14.  Furthermore, SFEI asserts, "[t]he undisputed evidence reflects that Tyler had water quality data analysis experience based on his conducting research on agricultural peatland soils, and Dan had water quality data analysis based on his work investigating historical trends in clams in response to eutrophication and environmental change in the Red Sea." *Id.* at 15 (citing Hunt Decl. ¶¶ 8, 14, 36 & Ex. E, G, Q).

SFEI also rejects Plaintiff's assertion that it "manipulated the screening questionnaire to specifically exclude Plaintiff in the event Plaintiff were to apply for the position[,]" arguing that this "unsupported conspiracy theory should be disregarded by the Court." *Id.* at 16. Likewise, SFEI contends the Court should disregard Plaintiff's unsupported allegation that "Tyler declined the position and that Adrianne declined the second-round interview because they recognized a mismatch between their qualifications and the position requirements and determined they were not suited for the role." *Id.* at 17.

Nor does the evidence show that the selection of Dan was predetermined, as Plaintiff contends, according to SFEI. *Id.* at 17-18.  SFEI notes that while Senn described Dan as a "promising candidate" based on his application materials, "this is by no means a predetermined 'endorsement' of a specific candidate." *Id.*   Furthermore, SFEI asserts, "Plaintiff has not produced any evidence to establish that [Senn] made any hiring decision until after the hiring committee conducted three rounds of interviews and submitted independent feedback and rankings regarding the candidates to avoid 'group think.'" *Id.*  at 18.  And "even if Defendant was flawed in its hiring criteria or assessment of the candidates and offered the position to the 'wrong' candidate, that does not violate Title VII[,]" SFEI contends.  *Id.* (citing *De Markoff v. Super. Ct. of Cal.*, 2014 WL 2895200, at *7 (E.D. Cal. June 25, 2014);  *McKennon v. Nashville Banner Pub. Co.*, 115 S.Ct. 879, 886 (1995)).

### H.    Discussion

#### 1.  Legal Standards Governing Summary Judgment

Summary judgment on a claim or defense is appropriate "if the movant shows that there is

25

no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In order to prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the non-moving party's claim, or to a defense on which the non-moving party will bear the burden of persuasion at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to designate "'specific facts showing there is a genuine issue for trial.'"  *Id.* (citation omitted); *see also* Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . .").  "[T]he inquiry involved in a ruling on a motion for summary judgment . . . implicates the substantive evidentiary standard of proof that would apply at the trial on the merits."  *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 252 (1986).  The non-moving party has the burden of identifying, with reasonable particularity, the evidence that precludes summary judgment.  *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996).  Thus, it is not the task of the court to scour the record in search of a genuine issue of triable fact.  *Id.*; *see Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001); Fed. R. Civ. P. 56(c)(3).

On summary judgment, the court draws all reasonable factual inferences in favor of the non-movant, *Scott v. Harris*, 550 U.S. 372, 378 (2007), but where a rational trier of fact could not find for the non-moving party based on the record as a whole, there is no "genuine issue for trial" and summary judgment is appropriate.  *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986).

### 2.  Legal Standards Under *McDonnell-Douglas*

The Ninth Circuit applies the *McDonnell Douglas* three-step burden shifting framework to evaluate motions for summary judgment under Title VII and the ADEA. *Shelley v. Geren*, 666 F.3d 599, 607–08 (9th Cir. 2012); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). At the first step, the employee must establish a prima facie case of discrimination. *McDonnell-Douglas*, 411 U.S. at 802. If the employee meets that burden, the analysis proceeds to the second step. *Id.*  At this step, the "burden of production, but not persuasion, . . .  shifts to the employer to

26

United States District Court
Northern District of California

articulate some legitimate, nondiscriminatory reason for the challenged action." *Chuang v. Univ. of California Davis, Bd. of Trs.*, 225 F.3d 1115, 1123–24 (9th Cir. 2000) (citing *McDonnell-Douglas*, 411 U.S. at 802). "If the employer does so, the plaintiff must show that the articulated reason is pretextual 'either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.' " *Id.* (quoting Texas *Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 256 (1981)).

To make a prima facie case of discrimination based under failure to hire under Title VII and the ADEA, a plaintiff must establish that (1) they are a member of a protected class;  (2) they applied for and were qualified for a job for which the employer was seeking applicants; (3) they were rejected despite being qualified for the job; and (4) the employer filled the position with an employee not of plaintiff's class, or continued to consider other applicants whose qualifications were comparable to plaintiff's after rejecting plaintiff. *McDonnell Douglas Corp. v. Green*, 411 U.S. at 802; *Cotton v. City of Alameda*, 812 F.2d 1245, 1248 (9th Cir. 1987). "At summary judgment, the degree of proof necessary to establish a prima facia case is minimal and does not even need to rise to the level of a preponderance of the evidence." *Lyons v. England*, 307 F.3d 1092, 1112 (9th Cir. 2002) (citing *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994)) (internal quotation marks omitted).

To survive summary judgment where the plaintiff has made a prima facie case of discrimination and the defendant has articulated a legitimate, non-discriminatory reason for the alleged adverse employment action, a plaintiff must offer direct evidence or specific and substantial circumstantial evidence that the proffered reason is pretextual. *Manatt v. Bank of Am.*, NA, 339 F.3d 792, 801 (9th Cir. 2003);  *see also Dominguez-Curry v. Nev. Transp. Dept.*, 424 F.3d 1027, 1037 (9th Cir. 2005) (citing *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1220–22 (9th Cir. 1998) ("The plaintiff may show pretext either (1) by showing that unlawful discrimination more likely motivated the employer, or (2) by showing that the employer's proffered explanation is unworthy of credence because it is inconsistent or otherwise unbelievable.").

### 3. Whether Plaintiff has Established that there are Triable Issues Relating to Pretext

The Court assumes without deciding that Plaintiff has established a prima facie case of discrimination. The question before the Court is whether Plaintiff has pointed to evidence sufficient to survive summary judgment that the non-discriminatory reason SFEI has offered for declining to hire her (or even to advance her to the screening interview stage of the hiring process), namely, that she did not have experience using any of the three programming languages used at SFEI, was a pretext for discriminating against her based on her age, race or national origin. The Court finds that she has not.

SFEI has offered evidence that it sought to hire for the Environmental Scientist position an individual with strong data analysis skills, including facility in at least one of the three programming languages used at SFEI (R Programming Language, Python or Metlab). It has also offered evidence that: 1) all of the candidates who were advanced for a screening interview ranked themselves as "intermediate" or "advanced" as to at least one of those languages (including the candidates who were eventually selected to receive offers, Tyler and Dan), whereas Plaintiff ranked herself as "beginner" in all three; 2) Lisa Hunt was the sole decision-maker as to whether Plaintiff would receive a screening interview; 3) Lisa Hunt had no actual knowledge about Plaintiff's demographic information, had never communicated with David Senn about Plaintiff and did not know who she was; and 4) at the time she first reviewed Plaintiff's application, on October 14, 2021, she made a notation on the Smartsheet that Ma did not "appear to have the data analysis skills [SFEI was] looking for[.]" and wrote "no" in the screening interview column.[8] Hunt Decl., Ex. D.

Plaintiff has not offered any specific evidence controverting these facts and she has pointed to no direct evidence of discriminatory animus by Lisa Hunt or anyone else involved in hiring for the Environmental Scientist position. Instead, she argues that notwithstanding her lack of experience with any of the three programming languages identified in the screening questionnaire,

---

[8] Hunt also listed Ma's lack of program manager experience as a con but that is not the reason SFEI has offered under the *McDonnell-Douglas* framework and therefore the Court need not consider it.

28

United States District Court
Northern District of California

she was more qualified than the candidates who were selected to receive offers, Tyler and Dan (whom she assumes to be younger than her and not in a protected class with respect to race and national origin), suggesting that her superior qualifications give rise to an inference of discriminatory intent.  However, Plaintiff's subjective opinions about her qualifications are not sufficient to create a dispute of material fact as to discriminatory intent.  *Bradley v. Harcourt, Brace & Co.*, 104 F.3d 267, 270 (9th Cir. 1996) ("an employee's subjective personal judgments of her competence alone do not raise a genuine issue of material fact.").  Nor has she offered any other "specific and substantial evidence" that SFEI rejected her application based on her age, race, or national origin.

Instead, Plaintiff has speculated that the screening questionnaire was somehow manipulated to prevent her from being hired and that Hunt and Senn and possibly others conspired against her.  Yet there is no evidence of such a conspiracy or that Senn (or anyone else at SFEI other than Hunt) was involved in any way in the decision not to hire Plaintiff.   Furthermore, the Court has already rejected Plaintiff's accusations of litigation misconduct by SFEI.  *See* dkt. no. 74. Plaintiff's unsupported conspiracy theories are not sufficient to demonstrate the existence of any material dispute of fact as to SFEI's alleged discriminatory intent in rejecting Plaintiff's application for the Environmental Scientist position in the fall of 2021.  Therefore, the Court concludes that SFEI is entitled to summary judgment in its favor on all of Plaintiff's remaining discrimination claims.

## V.    CONCLUSION

For the reasons stated above, the Sanctions Motion is GRANTED in part.  Plaintiff is ordered to pay $2,400 in sanctions to SFEI based on her violation of the protective order in this case.  The Court's rulings on the sealing motions are set forth above. SFEI's Summary Judgment

United States District Court
Northern District of California

29

Motion is GRANTED.  The Clerk is instructed to enter judgment in favor of SFEI and close the case.

**IT IS SO ORDERED.**

Dated: February 11, 2026

_____
JOSEPH C. SPERO
United States Magistrate Judge